EXHIBIT 2
PRESIDIO ADVISORS v. U.S.
CFC No. 05-411 T

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | INFORMATION |
| - against - | : | 05 Cr. ( ) |
| KPMG LLP, | : | |
| Defendant. | : | |

**<u>COUNT ONE</u>**
**(Conspiracy)**

The United States Attorney charges:

**Background**

<u>Pertinent Entities</u>

1. At all times relevant to this Information, KPMG LLP ("KPMG") was a limited liability partnership headquartered in New York, New York, and with more than 90 offices nationwide. KPMG LLP is and was a member firm of KPMG International, a Swiss cooperative of which all KPMG firms worldwide are members. At all times relevant to this Information, KPMG was one of the largest auditing firms in the world, providing audit services to many of the largest corporations in the United States and elsewhere.

2. In addition, KPMG was in the business of providing tax services to

corporate and individual clients, including some of the wealthiest individuals in the United States. These tax services included, but were not limited to, preparing tax returns, providing tax planning and tax advice, and representing clients in Internal Revenue Service ("IRS") audits and Tax Court litigation with the IRS. The portion of KPMG's tax practice that specialized in providing tax advice to individuals, including wealthy individuals, was known as Personal Financial Planning, or "PFP." The KPMG group focused on designing, marketing, and implementing tax shelters for individual clients was known at different times as CaTS ("Capital Transaction Strategies"), and IS ("Innovative Strategies"). The KPMG group focused on designing, marketing, and implementing tax shelters for corporate clients was known as Stratecon. KPMG also had a department within the tax practice known as Washington National Tax, which was designed to provide expert tax advice to KPMG professionals in the field, and which participated in designing tax shelters and drafting opinion letters relating to those shelters.

3. At all times relevant to this Information, "Bank A" was a foreign bank with its principal United States branch located in New York, New York.

4. At all times relevant to this Information, "Bank B" was a foreign bank with its principal United States branch located in New York, New York.

5. At all times relevant to this Information, "Bank C" was a foreign bank.

6. At all times relevant to this Information, "Bank D" was a foreign bank with its principal United States branch located in New York, New York.

7. In or about 1997, two former KPMG tax professionals, who are co-conspirators not named as defendants herein, formed a limited liability company with its principal office located in San Francisco and a satellite office located in Denver. In or about 1999, these two individuals and another individual formed another limited liability company with its principal office located in San Francisco and a satellite office located in Denver. As detailed more fully below, the conspirators used the two limited liability companies described in this paragraph and certain related entities (collectively referred to herein as "the SF Entities") to participate in certain tax shelter transactions as, among other things, the purported investment advisor.

**Tax Shelter Fraud**

8. During the period from at least in or about 1996 through at least in or about 2003, the defendant KPMG, and others known and unknown (hereinafter the "co-conspirators"), participated in a scheme to defraud the IRS by devising, marketing, and implementing fraudulent tax shelters, by preparing and causing to be prepared, and filing and causing to be filed with the IRS false and fraudulent U.S. individual income tax returns containing the fraudulent tax shelter losses, and by fraudulently concealing from the IRS those shelters. This illegal course of conduct was deliberately approved and perpetrated at the highest levels of KPMG's tax management, and involved dozens

of KPMG partners and other personnel.

9. KPMG and its co-conspirators designed and marketed these shelters as a means for wealthy individuals with taxable income or gains generally in excess of \$10 million in 1997 and of \$20 million in 1998-2000 fraudulently to eliminate or reduce the tax paid to the IRS on that income or gain. As marketed and implemented, instead of the wealthy clients paying U.S. individual income taxes generally exceeding 20% of the income or gain, the client could choose the amount of tax loss desired and pay certain of the conspirators and others an all-in cost generally equal to approximately 5 to 7% of the desired tax loss. This "all-in" cost included the fees of KPMG, the SF Entities, the various law firms that supplied opinion letters, including a prominent national law firm with offices in New York, New York (the "Law Firm"), the bank participants, and others, as well as a small portion that would be used to execute purported "investments" that were designed to make it appear that the shelters were legitimate "investments" rather than tax shelters. The size of the purported "investments," the timing of the transactions, and the amount of the fees to certain conspirators and participants were all determined based on the tax loss to be generated.

10. In order to conceal the true nature of the tax shelter from the IRS and shield the wealthy clients from IRS penalties for underpayment of U.S. individual income taxes, KPMG and/or a law firm provided the clients with opinion letters containing false and fraudulent representations and statements and claiming that the tax

shelter losses were "more likely than not" to survive in court if challenged by the IRS. The law in effect from at least in or about August 1997 provided that if a taxpayer claimed a tax benefit that was later disallowed, the IRS would impose substantial penalties, usually at least 20% of the tax deficiency, unless the tax benefit was supported by an independent opinion relied on by the taxpayer in good faith that the tax benefit was "more likely than not" to survive IRS challenge. Thus, the conspirators issued false and fraudulent opinion letters with the intent that the clients would provide the opinion letter and/or the false and fraudulent representations and statements contained therein to the IRS if and when the clients were audited.

11. Among the fraudulent tax shelter transactions designed, marketed, and implemented by KPMG, its personnel, and their co-conspirators were FLIP ("Foreign Leveraged Investment Program"), OPIS ("Offshore Portfolio Investment Strategy"), BLIPS ("Bond Linked Issue Premium Structure"), SOS ("Short Option Strategy") and their variants.

12. FLIP was marketed and sold from at least in or about 1996 through at least in or about 1999 to at least 80 wealthy individuals and generated at least $1.9 billion in phony tax losses; KPMG's gross fees from FLIP transactions were at least $17 million; the Law Firm's gross fees from FLIP transactions were at least $3 million; the SF Entities' gross fees from FLIP transactions were at least $3 million.

13. OPIS was marketed and sold from at least in or about 1998 through

at least in or about 1999 to at least 170 wealthy individuals, and generated at least $2.3 billion in phony tax losses; KPMG's gross fees from OPIS transactions were at least $28 million; the Law Firm's gross fees from OPIS transactions were at least $7 million; the SF Entities' gross fees from OPIS transactions were at least $12 million.

14. BLIPS was marketed and sold from at least in or about 1999 through at least in or about 2000 to at least 186 wealthy individuals, and generated at least $5.1 billion in phony tax losses; KPMG's gross fees from BLIPS transactions were at least $53 million; the Law Firm's gross fees from BLIPS transactions were at least $13 million; the SF Entities' gross fees from BLIPS transactions were at least $123 million.

15. SOS was marketed and sold from at least in or about 1998 through at least in or about 2002 to at least 165 wealthy individuals, and generated at least $1.9 billion in phony tax losses; KPMG's gross fees from SOS transactions were at least $17 million. Among the individuals who used BLIPS and SOS-type shelters to evade their own taxes were at least 14 KPMG partners, and other co-conspirators.

16. The total amount of taxes evaded through the use of FLIP, OPIS, BLIPS, and SOS transactions was at least $2.5 billion.

The Fraudulent FLIP and OPIS Shelters

17. FLIP and OPIS were substantially similar. FLIP and OPIS were generally marketed only to people who had capital gains in excess of $10 million for FLIP and $20 million for OPIS. These shelters were designed to generate substantial

phony capital losses (i.e., in excess of $10 million for FLIP and in excess of $20 million for OPIS) through the use of an entity created in the Cayman Islands (a tax haven), for purposes of the tax shelter transaction. The client purportedly entered into an "investment" transaction with the Cayman Islands entity by purchasing a purported warrant or entering into a purported swap. The Cayman Islands entity then made a pre-arranged series of purported investments, including the purchase from either Bank A or Bank D of either Bank A or Bank D stock using money purportedly loaned by Bank A or Bank D, followed by redemptions of those stock purchases by the pertinent bank. The purported investments were devised to eliminate economic risk to the client beyond the all-in cost and minimize the amount of the all-in cost used for the investment component. The purported investments were also devised to last for only approximately 16 to approximately 60 days.

18. In return for fees totaling approximately 7% of the desired tax loss, including a fee to KPMG equal to approximately 1.25% of the desired tax loss, KPMG and its co-conspirators implemented and caused to be implemented FLIP and OPIS transactions and generated and caused to be generated false and fraudulent documentation to support the transactions, including but not limited to KPMG opinion letters claiming that the purported tax losses generated by the shelters were more likely than not to withstand challenge by the IRS. A New York tax partner at the Law Firm, who is a co-conspirator not named as a defendant herein, also issued "more likely than

not" opinion letters in return for fees typically of approximately $50,000 per opinion, which opinions tracked, sometimes verbatim, the KPMG opinion letter. In general, all of these opinion letters were identical, except for the names of the clients, the names of the entities, the dates, and the dollar amounts involved in the transactions.

19. KPMG and its co-conspirators issued and caused to be issued the opinion letters although, as they well knew, (i) the tax positions taken were *not* more likely than not to prevail against an IRS challenge if the true facts regarding those transactions were known to the IRS, and (ii) the opinion letters and other documents used to implement FLIP and OPIS were false and fraudulent in a number of ways, including but not limited to the following:

a. The opinion letters began by falsely stating that the client requested KPMG's opinion "regarding the U.S. federal income tax consequences of certain investment portfolio transactions," when in truth and in fact, the conspirators targeted wealthy clients based on the clients' large taxable gains and, in return for substantial fees to KPMG, the SF Entities, the Law Firm, certain co-conspirators, and others, offered to generate phony tax losses to eliminate income tax on that gain, and offered to provide a "more likely than not" opinion letter.

b. The opinion letter continued by falsely stating that the "investment strategy was based on the expectation that a leveraged position in the Foreign Bank securities would provide investor with the opportunity for capital

appreciation," when in truth and in fact the strategy was based on the expected phony tax benefits promised by certain conspirators.

c. The opinion letters also falsely claimed that the clients "reviewed the economics underlying the investment strategy and believed it had a reasonable opportunity to earn a reasonable profit from each of the transactions . . . in excess of all associated fees and costs and not including any tax benefits that may occur" when in truth and in fact, there was no such opportunity.

d. The opinions falsely claimed that one of the participants in the transaction (an owner of the Cayman Islands entity) was a foreign person unrelated to the other participants, when in truth and in fact this foreign person was simply a nominee who received a fee to assist KPMG, other co-conspirators, and other participants in generating the phony tax losses, and one of the foreign persons had an ownership interest in the SF Entities, which participated in many of these transactions.

e. The opinion letters falsely stated that money was paid by the FLIP and OPIS clients for an "investment" component of the transactions (a warrant or a swap), when in truth and in fact that money constituted fees paid to KPMG, the Law Firm, the bank participant, the nominee foreign person, and other participants, as well as money that was temporarily parked in the deal but ultimately returned to the client.

f. The opinion letters also falsely claimed that there was no evidence of a "firm and fixed" plan to complete the steps making up the shelter in a particular manner, when in truth and in fact, there was such a plan, and the transactions in fact were completed in that particular manner which was designed to generate the tax loss.

g. The opinion letters stated that the clients were "more likely than not" to survive an IRS challenge to the transactions based on the "step transaction doctrine" — a legal doctrine permitting the IRS to disregard certain transactions having no economic substance or business purpose and the purported tax effects of those disregarded transactions. This assertion was false, as the conspirators well knew. Indeed, a co-conspirator not named as a defendant herein ("CC 1"), who at the time was in charge of CaTS, instructed KPMG partners involved in marketing OPIS not to permit KPMG clients who were pitched OPIS to retain a copy of KPMG's PowerPoint presentation describing the transaction "under any circumstances" because to do so would "DESTROY any chance the client may have to avoid the step transaction doctrine."

<u>The Fraudulent BLIPS Shelter</u>

20. BLIPS was designed to generate substantial capital and ordinary tax losses through a series of pre-arranged transactions that involved the client purportedly borrowing money from one of three banks — Bank A, Bank B, or Bank C — in order to

make purported foreign currency investments including currencies that were "pegged" to the United States dollar. The bank involved in the purported loan also served as the counterparty on all of the purported currency and other transactions involved in BLIPS. The transaction was designed by KPMG and its co-conspirators so that after a short period of time (virtually always approximately 67 days), the client would exit the purported BLIPS transaction and trigger the desired tax loss.

21. In return for fees totaling approximately 7% of the desired tax loss, including a fee to KPMG equal to approximately 1.25% of the desired tax loss, a fee to the SF Entities equal to approximately 2.75% of the desired tax loss, and a fee to the Law Firm generally equal to approximately $50,000 per transaction, KPMG and its co-conspirators and others implemented and caused to be implemented the transactions and generated and caused to be generated false and fraudulent documentation to support the transactions, including but not limited to KPMG and the Law Firm opinion letters claiming that the purported tax losses generated by the shelters were more likely than not to withstand challenge by the IRS. In general, all of these opinion letters were identical, except for the names of the clients and entities involved, the dates, and the dollar amounts involved in the transactions.

22. KPMG and its co-conspirators issued and caused to be issued the opinion letters although, as they well knew, (i) the tax positions taken were *not* more likely than not to prevail against an IRS challenge if the true facts regarding those

transactions were known to the IRS, and (ii) the opinion letters and other documents used to implement BLIPS were false and fraudulent in a number of ways, including but not limited to the following:

a. BLIPS was falsely and misleadingly described as an investment program, when in truth and in fact, BLIPS was designed, marketed, and implemented to generate phony tax losses in order to eliminate income taxes for wealthy clients and garner substantial fees and income for KPMG, the SF Entities, the Law Firm, certain co-conspirators, and others.

b. BLIPS was falsely described as a three-stage, seven-year investment program, when in truth and in fact, all participants were expected to withdraw at the earliest opportunity and within the same tax year in order to obtain their tax losses. Indeed, KPMG and its co-conspirators caused the opinion letters to contain a false representation (which BLIPS clients adopted) that the duration of the client's participation in the three-phase, seven-year investment program was dependent upon the performance of the program relative to alternative investments, when in truth and in fact, the duration of the client's participation was dependant on the client's desire to obtain the phony tax losses to be generated.

c. BLIPS was falsely described as a "leveraged" investment program, when in truth and in fact, the purported loan transactions that were part of BLIPS

(and were the aspect of BLIPS that purported to generate the tax loss) were shams — no money ever left the bank and none of the banks assigned any capital cost to these purported BLIPS loans. Indeed, at least one of the banks did not fund the loans at all — it neither set aside from its own funds nor obtained from the market any money to cover these purported "loans" and "loan premiums." In addition, the sham loans were not in any way used in the purported "investment" program involving trades relating to pegged currencies but, instead, were used only to generate a phony tax loss. The only money used in making and securing the trades involving pegged currencies as part of BLIPS was money contributed by the client as part of the 7% all-in cost.

d. The BLIPS opinion letters falsely stated that the client (based on the client's purported "independent review") as well as the SF Entities "believed there was a reasonable opportunity to earn a reasonable pre-tax profit from the [BLIPS] transactions," when in truth and in fact, there was no "reasonable likelihood of earning a reasonable pre-tax profit" from BLIPS, and instead the "investment" component of BLIPS was negligible, unrelated to the large sham "loans" that were the key elements of the purported tax benefits of BLIPS, and was simply window dressing for the BLIPS tax shelter fraud.

e. The opinion letters and other documents were misleadingly drafted to create the false impression that KPMG and others were independent service

providers and advisors, rather than co-promoters and designers of the BLIPS shelter. Thus, for example, the KPMG BLIPS opinion letter misleadingly claims that the client "requested our opinion regarding the U.S. federal income tax consequences of certain investment transactions that have been concluded" but the opinion letters, which falsely describe a purported seven-year investment program and a withdrawal from that program based on the purported investment performance of the program, were drafted prior the commencement of any BLIPS transaction.

f. Similarly, the KPMG engagement letter used for BLIPS contained the following false and fraudulent statements, among others, (i) that the client had engaged KPMG "to provide tax consulting services . . . with respect to participation in an investment program involving investments in foreign currency positions," when in truth and in fact KPMG marketed a tax shelter to the clients, and the clients engaged KPMG to assist the clients in generating phony tax losses using the tax shelter; (ii) that KPMG "understands that Client intends to engage" the SF Entities "to provide Client with investment advisory services and trading strategies," when in truth and in fact, the SF Entities were engaged to assist the clients in generating phony tax losses using a tax shelter; (iii) that the SF Entities "had advised the Client that the utilization of a high degree of leverage is integral to the Investment Program," when in truth and in fact, the purported "leverage"

was a sham loan designed only to support the creating of phony tax losses; and (iv) that KPMG's fees would not be dependent on "the amount of any tax savings projected," when in truth and in fact the amount of KPMG's fee, as well as the size of the nominal investment made as part of the fraudulent tax shelter, and fees for the SF Entities and other participants in the transaction were all determined by the amount of phony tax losses desired by the client to offset income or gain received from other sources.

23. At various points during the development of BLIPS, KPMG personnel and others identified various significant defects of BLIPS, including that the description of BLIPS and the factual representations contained in the BLIPS opinion letter and in other documents were false, but nevertheless KPMG approved the issuance of BLIPS opinion letters. When Washington National Tax approved the BLIPS documentation in August 1999, one of the KPMG tax shelter salesmen who helped devise BLIPS (a co-conspirator not named as a defendant herein) wrote another co-conspirator not named as a defendant herein "We have received our 'get out of jail free card' from [Washington National Tax]."

24. In addition, in or about March 2000, and prior to the issuance of any BLIPS opinion letters to clients, during a meeting attended by members of KPMG tax leadership, a representative from KPMG's office of general counsel, and others, a top KPMG technical expert involved in reviewing the KPMG BLIPS opinion told the other

participants in substance and in part that if the IRS were to litigate BLIPS in court, the BLIPS participants would "lose." In addition, another member of KPMG's tax leadership informed the participants at the meeting, in substance and in part, that the tax position taken in BLIPS was "close to frivolous." During that meeting, the participants also discussed the risks of proceeding with tax shelter transactions like BLIPS, including the risk of criminal investigation, civil penalties, civil liability for fraud, action by the IRS's Director of Professional Practice, and action by state Boards of Accountancy. Nevertheless, and despite the obviously fraudulent nature of BLIPS and the warnings conveyed, KPMG leadership decided to (i) proceed with the issuance of "more likely than not" opinion letters on all of the 1999 transactions, and (ii) continue to implement more BLIPS tax shelter transactions in 2000.

The Fraudulent SOS Shelter

25. SOS and its variants were designed to generate substantial capital and ordinary tax losses through a series of pre-arranged transactions that involved the clients entering into virtually offsetting foreign currency option positions with a bank, including but not limited to Bank A, transferring the offsetting positions to a partnership or other entity, and then withdrawing from the transaction, claiming a loss in the desired amount. KPMG's Washington National Tax office considered whether KPMG should issue "more likely than not" opinions regarding SOS-type transactions, and concluded that the phony losses generated by those transactions were *not* more likely than not to

withstand IRS challenge. Nevertheless, between 1998 and 2002, certain KPMG tax partners assisted in implementing SOS-type transactions for KPMG clients for a fee to KPMG generally equal to 1% of the tax losses to be generated, and prepared and caused to be prepared tax returns based on the phony SOS tax losses. For many of these SOS-type transactions, KPMG did not issue an opinion letter, but instead certain lawyers issued "more likely than not" opinion letters with respect to those transactions. The SOS opinion letters, and other associated documents, were false and fraudulent in a number of ways well known to KPMG and the KPMG tax partners involved, including the following:

a. They misrepresented SOS as an investment, when in truth and in fact, it was a tax shelter designed to generate tax losses in order to eliminate income taxes for wealthy clients and garner substantial fees and income for KPMG, certain co-conspirators, and others.

b. They falsely claimed that the client would have entered into the option positions independent of the other steps that made up SOS, when in truth and in fact, the clients would not have entered into those positions absent the anticipated tax loss to be generated.

c. They falsely claim that the option positions were contributed to a partnership or other entity to "diversify" the client's "investment" when in truth and in fact, the contribution was simply a necessary step in the tax shelter, was

executed for the purpose of generating the tax loss, and was not executed to "diversify" any "investment."

d. They falsely claim that the client entered into the offsetting option positions for "substantial non-tax business reasons," and contributed the option positions to the partnership or other entity for "substantial non-tax business reasons," when in truth and in fact, the transactions were undertaken in order to generate the phony tax losses SOS purported to generate and not for any "substantial non-tax business reason."

26. In addition, from at least in or about 1999 through at least in or about 2002, a KPMG partner, who is a co-conspirator not named as a defendant herein ("CC 2"), with the approval of members of KPMG's tax leadership, marketed and implemented dozens of SOS-type transactions to KPMG clients, often charging fees well in excess of 1% of the phony tax loss to be generated. CC 2 also arranged SOS-type transactions for at least 14 KPMG partners so that those partners could evade their own taxes. In connection with the SOS-type transactions arranged by CC 2, CC 2 issued KPMG opinion letters or caused others to issue opinion letters that falsely claimed that the tax losses purportedly generated by SOS were more likely than not to withstand IRS challenge. These opinions were false and fraudulent in a number of ways well known to CC 2 and his co-conspirators, including but not limited to the following:

a. They misrepresented SOS as an investment, when in truth and in

fact, it was a tax shelter designed to generate tax losses in order to eliminate income taxes for wealthy clients and garner substantial fees for KPMG, certain co-conspirators, and others.

b. They falsely claimed that the client would have entered into the option positions independent of the other steps that made up SOS, when in truth and in fact, the clients would not have entered into those positions absent the anticipated tax loss to be generated

c. They falsely claim that the option positions were contributed to a partnership or other entity to "diversify" the client's "investment" when in truth and in fact, the contribution was simply a necessary step in the tax shelter, was executed for the purpose of generating the tax loss, and was not executed to "diversify" any "investment."

d. They falsely claim that the client entered into the offsetting option positions for "substantial non-tax business reasons," and contributed the option positions to the partnership or other entity for "substantial non-tax business reasons," when in truth and in fact, the transactions were undertaken in order to generate the phony tax losses SOS purported to generate and not for any "substantial non-tax business reason."

**Fraudulent Concealment of Tax Shelters**

27. In addition to preparing and causing to be prepared false and

fraudulent documentation relating to and implementing the shelter transactions, and in addition to preparing and causing to be prepared tax returns that fraudulently incorporated the phony tax shelter losses, KPMG and its co-conspirators employed various means fraudulently to conceal from the IRS the fraudulent tax shelters they designed, marketed and implemented, including but not limited to the following: (i) not registering the tax shelters with the IRS as required by law; (ii) preparing and causing to be prepared tax returns that fraudulently concealed the phony losses from the IRS; (iii) attempting to conceal from the IRS the tax shelter losses and transactions with sham attorney-client privilege claims; and (iv) obstructing IRS and Senate investigations into their tax shelter activities.

<u>Failing to Register Tax Shelters</u>

28. Under the law in effect at all times relevant to this Information, an organizer of a tax shelter was required to "register" the shelter by filing a form with the IRS describing the transaction. The IRS in turn would issue a number to the shelter, and all individuals or entities claiming a benefit from the shelter were required to include with their income tax returns a form disclosing that they had participated in a registered tax shelter, and disclosing the assigned registration number. Notwithstanding these legal requirements, KPMG and its co-conspirators decided not to register as required any of the tax shelters KPMG devised, marketed and implemented, and thereby ensured that registration numbers would not be included on returns relating to unregistered shelters.

29. Thus, KPMG decided not to register FLIP, OPIS, or BLIPS based on a "business decision" that to register the shelters would hamper KPMG's ability to sell them, and that the IRS penalties applicable to a failure to register would be dwarfed by the lucrative fees KPMG stood to collect from selling unregistered tax shelters. Indeed, CC 1 wrote a memorandum to a member of KPMG's tax leadership arguing that, assuming OPIS was required to be registered, KPMG should make a "business decision" not to register OPIS because (i) registering the shelters would put KPMG at a competitive disadvantage as compared to other accounting firms, law firms, and other firms that were promoting tax shelters; and (ii) selling unregistered shelters would be so lucrative that the benefits outweighed the risk of civil penalties that might be imposed. Moreover, KPMG's office of general counsel, among others, advised that by deciding not to register tax shelters, KPMG risked criminal prosecution, but like the CaTS group, advised that KPMG's tax leadership could nevertheless "make a business decision to not register the activity as a tax shelter."

Fraudulently Concealing Shelter Losses and Income on Tax Returns

30. The conspirators would and did prepare and cause to be prepared tax returns that were false and misleading and were intended fraudulently to conceal the fraudulent tax shelters from the IRS in a number of ways, including but not limited to the following:

a. Although the law requires that an individual's items of income, gain,

and loss be reported on an individual income tax return, KPMG personnel their co-conspirators advised certain clients that the phony tax shelter losses and the income or gains that were to be sheltered should not be reported on the client's individual income tax return, and instead only the net of those two figures should be reported on the return. One method of "netting" pursued by the conspirators in order fraudulently to hide the tax shelter transactions from the IRS involved using a "grantor trust." A grantor trust is a trust that, because of certain features enumerated in the tax code, is disregarded as an entity for federal income tax purposes. CC 1 and his co-conspirators devised a scheme to insert a grantor trust into a tax shelter transaction, and then, rather than disregarding the grantor trust as required by the tax code, reporting the large phony tax shelter loss and the taxable gain or income those losses were used to offset only on the grantor trust information return, while reporting only the small net of those numbers on the client's individual income tax return. Although members of the Innovative Strategies group were notified that to pursue this "grantor trust netting" scheme was *not* a proper reporting position, and in fact would result in the filing of false income tax returns, KPMG permitted its partners to decide for themselves whether to engage in grantor trust netting. As a result, dozens of tax returns for FLIP, OPIS, and BLIPS clients used grantor trusts fraudulently to hide the tax shelter losses (and the gains they were designed to shelter) on the clients' individual

income tax returns.

b. In order to conceal tax shelter losses from the IRS, a KPMG tax partner who is a co-conspirator not named as a defendant herein ("CC 3"), and others, advised at least one client that phony tax shelter losses could be concealed and made to look like losses from the sale of a number of publicly traded stocks. In order to so conceal the losses, the SF Entities purchased publicly traded stock on behalf of the shelter client, and then distributed those stocks to the client upon the client's withdrawal from the transaction. CC 3 and others then advised that the shelter could be concealed on the client's tax return and instead reported as losses resulting from the sale of the stock so distributed. In order to further conceal the phony tax shelter losses from the IRS, in some instances CC 3 and others purchased stocks that had already suffered large losses during the year as the stocks to which the shelter losses would be attached, in order to mislead the IRS into believing that the losses resulted from those stocks' poor performance, rather than from the fraudulent tax shelters.

Concealing Shelters with Sham Attorney-Client Privilege Claims

31. The conspirators also attempted to conceal their fraudulent tax shelter activities by attempting to cloak communications regarding those activities and certain of the activities themselves with the attorney-client privilege, although the communications in question were not privileged. For example, CC 2 attempted to

conceal his activities in this manner by purporting to have KPMG clients engage a law firm to provide legal advice, which law firm would then purport to engage KPMG to work under the direction of the law firm. Under *United States v. Kovel*, communications by non-lawyer professionals such as accountants are protected under the attorney-client privilege when the accountant is in fact working under the direction of an attorney. Numerous *Kovel* arrangements established by CC 2 were sham arrangements because the clients did not directly engage the law firm, in many instances never even spoke to the lawyers whom they had purportedly engaged, and CC 2's work was done outside of the purported lawyer-client privilege. The purpose of this fraudulent conduct was to enable the client, with the assistance of CC 2 and the law firm, to conceal the fraudulent tax shelter from the IRS by attempting to cloak all of the work for the shelter in the attorney-client privilege.

Obstruction of IRS and Senate Investigations

32. Despite the conspirators' efforts to prevent IRS scrutiny of these fraudulent tax shelters, in or about September 2001 the IRS initiated an examination of KPMG for its failure to register the transactions with the IRS. As part of this examination, in early 2002 the IRS issued 25 summonses to KPMG calling for information relating to numerous tax shelters with which KPMG may have been involved. In addition, the IRS summonses required KPMG to designate a knowledgeable person to testify under oath at the IRS. KPMG designated a co-

conspirator not named as a defendant herein ("CC 6") , who at the time was the partner in charge of KPMG's Personal Financial Planning group, to testify. CC 6's testimony was false, misleading, and evasive. Indeed, after one day of testimony, another KPMG partner who attended the testimony reported in an email to a KPMG tax leader that KPMG's Office of General Counsel and outside counsel "determined that the best strategy was 'the less said the better,'" and that CC 6 "felt that he had no choice but to be 'forgetful.' And so the record will reflect repeated 'I don't knows', 'I don't recalls,' and 'I was out of the loops' — the rope-a-dope/Enron defense."

33. IRS summonses called for production of documents relating to SOS tax shelters, among other things. One of the KPMG tax leaders directing KPMG's response to the IRS summonses, who is a co-conspirator not named as a defendant herein ("CC 7") was aware of KPMG's involvement in promoting SOS transactions. Nevertheless, none of the SOS tax shelters marketed or implemented by KPMG, or in which KPMG personnel participated, were disclosed to the IRS and on a number of occasions, CC 7 and others caused KPMG falsely to claim to the IRS that the production of documents and information relating to the summonses was substantially complete.

34. In addition, when the IRS in May 2003 specifically inquired about KPMG's failure to produce SOS information, CC 6 intentionally caused KPMG's representatives to falsely respond that KPMG was not involved in SOS, but may have prepared a couple of tax returns containing SOS losses.

35. In January 2003, a Subcommittee of the United States Senate issued a subpoena to KPMG calling for documents and information relating to its tax shelter activities, including a specific request for documents relating to tax shelters used by KPMG partners to evade their own taxes. The subpoena specifically named CC 2 as well as at least two KPMG partners who, in fact, had used SOS transactions to evade their own taxes. CC 7 was among the KPMG personnel directing KPMG's response to the Senate investigation. In addition, CC 7 was aware of at least one KPMG partner who used an SOS-type shelter to offset the partner's own income or gain, and was aware of related documents responsive to the Senate subpoena. However, CC 7 and his co-conspirators caused KPMG's representatives falsely to respond to the subpoena as follows: "to the best of its knowledge and belief, after reasonable inquiry to date, the firm has not yet identified any documents that are responsive to this request."

36. In or about November 2003, CC 6, CC 7, other co-conspirators, and others testified before the Senate Subcommittee investigating tax shelter activities of KPMG and others. CC 6 and other KPMG personnel testified together in panel format. During this testimony, among other things, CC 6 falsely denied that KPMG's fee was a percentage of the tax loss to be generated by the shelters. In addition, when asked by a Senator whether FLIP, OPIS and BLIPS were "designed and marketed primarily as tax reduction strategies," CC 6 falsely stated "Senator, I would not agree with that characterization." In addition, among other false and misleading testimony presented at

the hearing, CC 7 gave evasive testimony regarding KPMG's involvement in designing, marketing, and implementing tax shelters.

**Statutory Allegations**

37. From at least in or about 1996 through at least in or about 2003, KPMG, the defendant, and its co-conspirators, unlawfully, willfully and knowingly, did combine, conspire, confederate and agree together and with each other to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201, 7206(1), and 7206(2).

**Objects of the Conspiracy**

38. It was a part and an object of the conspiracy that KPMG, the defendant, and its co-conspirators, unlawfully, willfully and knowingly would and did defraud the United States of America and the IRS by impeding, impairing, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

39. It was further a part and an object of the conspiracy that KPMG, the defendant, and its co-conspirators, unlawfully, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by tax shelter clients and others, in violation of Title 26, United States Code, Section 7201.

40. It was further a part and an object of the conspiracy that KPMG, the defendant, and its co-conspirators, unlawfully, wilfully and knowingly would and did (a) make and subscribe, and cause others to make and subscribe United States individual, corporation, and partnership income tax returns, which returns contained and were verified by written declarations that they were made under the penalties of perjury, and that the defendants and their co-conspirators did not believe to be true and correct as to every material matter; and (b) aid and assist in, and procure, counsel, and advise the preparation and presentation under, the internal revenue laws, of certain United States individual, corporation, and partnership income tax returns which were fraudulent and false as to material matters, in violation of Title 26, United States Code, Section 7206.

**Means and Methods of the Conspiracy**

41. Among the means and methods by which KPMG, the defendant, and its co-conspirators would and did carry out the conspiracy were the following:

a. They would and did concoct tax shelter transactions and false and fraudulent factual scenarios to support them so that wealthy United States citizens would pay certain of the conspirators and other participants in the transactions approximately 5 to 7% of income or gain instead of paying federal and state taxes on that income or gain.

b. They would and did prepare false and fraudulent documents to deceive the IRS, including but not limited to, engagement letters, transactional

documents, representation letters, and opinion letters.

c. They would and did conceal the contents of tax shelter sales presentations in order to prevent the IRS from discovering the true facts regarding those shelter transactions.

d. They would and did prepare and provide to their clients false and fraudulent representations that the clients were required to make in order to obtain opinion letters that purported to justify using the phony tax shelter losses to offset income or gain. At times, the conspirators presented to their clients these false and fraudulent client representations after the all-in costs of approximately 5 to 7% of the desired tax loss were collected from the tax shelter clients.

e. They would and did prepare and cause to be prepared tax returns that were false and fraudulent because, among other things, they incorporated the phony tax losses and therefore substantially understated the tax due and owing by the shelter clients.

f. They would and did (i) fraudulently omit on certain tax returns the losses and the gain or income they sheltered; and (ii) disguise the shelter losses on certain tax returns in a manner intended to deceive the IRS.

g. They would and did take various steps to prevent the creation and retention of documents that might reveal to the IRS the true facts regarding the fraudulent tax shelters as well as certain conspirators' role in designing,

marketing, and implementing them, including but not limited to concealing from the IRS that the opinion letters provided by KPMG, the Law Firm, and other firms were not independent and were instead prepared by entities involved in the design, marketing, and implementation of the tax shelters.

h. They would and did take various additional steps to conceal from the IRS the existence of the shelters, their true facts, and certain conspirators' role in designing, marketing, and implementing the shelters, including, but not limited to, failing to register the shelters, using sham attorney-client privilege claims, and concealing documents and providing false and misleading information in response to IRS and Senate investigations.

**Overt Acts**

42. In furtherance of the conspiracy and to effect the illegal objects thereof, KPMG, the defendant, and its co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. On or about July 18, 1997, a co-conspirator not named as a defendant herein prepared a memorandum to KPMG tax leaders discussing how KPMG and the SF Entities should jointly devise, market, and implement tax shelter transactions and how their fees should be divided.

b. In or about September 1997, KPMG and the SF Entities executed an "operating agreement" regarding joint marketing and implementation of FLIP

transactions.

c. On or about June 8, 1998, CC 1 advised the KPMG team marketing OPIS not to leave the OPIS PowerPoint presentation "with clients or targets under any circumstances" because doing so "will DESTROY any chance the client may have to avoid the step transaction doctrine."

d. On or about September 10, 1998, the defendant CC 6 sent an email to a KPMG tax leader and others proposing an "alliance" with a competitor of the SF Entities to implement OPIS transactions and noting that "we have very little time to work with if we are going to execute trades such that our clients can generate the desired benefits in calendar 1998."

e. On or about January 22, 1999, CC 6 instructed KPMG partners that each partner should decide for himself or herself whether to attempt to conceal losses from the IRS using a grantor trust.

f. In or about September or October 1999, Domenick DeGiorgio, a co-conspirator not named as a defendant herein , met at the offices of Bank B in the Southern District of New York with personnel of the SF Entities and others.

g. In or about 1999, in the Southern District of New York and elsewhere, Banks A, B, and C prepared and caused to be prepared transactional documents relating to BLIPS tax shelter transactions.

h. On or about December 8, 1999, a KPMG partner who is a co-

conspirator not named as a defendant herein advised other KPMG personnel involved in marketing and implementing BLIPS that a document on which the client selected how much of the BLIPS loss should be ordinary and how much should be capital should not be kept in the file because "if the IRS were to discover such a document it could look very bad for the client."

i. On or about March 7, 2000, members of KPMG tax leadership, a representative from KPMG's office of general counsel, and others met in the Southern District of New York to discuss, among other things, the risks of civil penalties and criminal investigation associated with completing the implementation of 1999 OPIS and BLIPS transactions.

j. On or about March 21, 2000, a KPMG tax partner who is co-conspirator not named as a defendant herein advised other KPMG personnel involved in marketing BLIPS that they should "NOT put a copy of" an email in their BLIPS file because "it is a roadmap for the taxing authorities to all the other listed transactions."

k. In or about 1998, 1999, and 2000, in the Southern District of New York and elsewhere, KPMG and other participants in FLIP and OPIS tax shelter transactions, who are co-conspirators not named as defendants herein, prepared, signed and filed tax returns that falsely and fraudulently claimed over $4.2 billion in phony tax losses generated by FLIP and OPIS transactions.

l. In or about 2000 and 2001, in the Southern District of New York and elsewhere, KPMG and other participants in BLIPS tax shelter transactions, who are co-conspirators not named as defendants herein, prepared, signed and filed tax returns that falsely and fraudulently claimed over $5.1 billion in phony tax losses generated by BLIPS transactions.

m. In or about 1999, 2000, and 2001, KPMG and other participants in SOS tax shelter transactions, who are co-conspirators not named as defendants herein, prepared, signed and filed tax returns that falsely and fraudulently claimed over $1.9 billion in phony tax losses generated by SOS.

n. On or about February 12, 2002, CC 6 provided false and misleading testimony under oath to the IRS.

o. On or about October 2, 2002, CC 7, on behalf of KPMG, sent a letter to the IRS in the Southern District of New York falsely claiming that "KPMG has at this time virtually completed its compliance with the summonses" although as CC 7 well knew, KPMG had produced no documents or information regarding its involvement in marketing and implementing SOS transactions.

p. On or about February 19, 2003, KPMG caused its representatives falsely to represent to the Senate that "after reasonable inquiry to date, the firm has not yet identified any documents" relating to shelter transactions used by KPMG partners to shelter their own income or gains, KPMG well knew that it had various

documents responsive to this subpoena request.

q. On or about November 18, 2003, CC 6 provided false and misleading testimony under oath to a Subcommittee of the United States Senate.

r. On or about November 18, 2003, CC 7 provided evasive testimony under oath to a Subcommittee of the United States Senate.

(Title 18, United States Code, Section 371.)

David N. Kelley

DAVID N. KELLEY
United States Attorney