UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------ X

UNITED STATES OF AMERICA :

INFORMATION

- against - :

06 Cr. (AKH)

BAYERISCHE HYPO- UND VEREINSBANK AG, :

:

Defendant.

------------------------------------ X

**COUNT ONE**
**(Conspiracy)**

The United States Attorney charges:

**Background**

1. At all times relevant to this Information, BAYERISCHE HYPO- UND VEREINSBANK AG, the defendant, was a Germany-based bank and financial institution that operated in the United States through a branch located at 150 East 42d Street, New York, New York. BAYERISCHE HYPO- UND VEREINSBANK AG was and is the parent to various subsidiaries, including HVB Risk Management Products Inc., HVB U.S. Finance Inc. (formerly known as HVB Structured Finance, Inc.), and HVB America, Inc. Collectively, BAYERISCHE HYPO- UND VEREINSBANK AG, HVB Risk Management Products Inc., HVB U.S. Finance Inc., and HVB America Inc. are referred to hereinafter as "HVB."

2. At all times relevant to this Information, HVB was in the business of providing various banking services, including providing financing to individuals and entities throughout the United States.

3. Between 1996 and 2003, Domenick DeGiorgio, a co-conspirator not named as a defendant herein, served as co-head of HVB's Financial Engineering Group ("FNE"), which group was based in HVB's New York, New York, office and was responsible for supervising HVB's participation in various tax shelter transactions. In carrying out a supervisory role at HVB's FNE, DeGiorgio met and corresponded with various tax shelter promoters to discuss whether HVB would participate in certain tax shelter transactions; met and corresponded with other senior officials of HVB to advocate HVB's participation in tax shelter transactions; with the approval of senior management of HVB, committed HVB to participate in over $3.5 billion worth of purported financing of tax shelter transactions that resulted in United States taxpayers claiming over $1,800,000,000 of fraudulent tax losses from the transactions; caused the drafting and execution of various documents that falsely and misleadingly described HVB's role in the tax shelter transactions; and caused HVB to receive and send, through its bank accounts located at HVB in New York, New York, various funds related to the tax shelter transactions in which HVB was involved.

**Tax Shelter Fraud**

4. During the period from at least in or about 1996 through at least in or about 2003, the defendant HVB, together with the accounting firm KPMG, LLP ("KPMG"), certain of KPMG's partners and employees, John Larson, Robert Pfaff, David Amir Makov, San Francisco-based companies controlled by Larson, Pfaff, and Makov and set up to participate in certain tax shelter transactions (the "Larson/Pfaff/Makov entities"), Raymond J. Ruble, also known as "R.J. Ruble," and others known and unknown (hereinafter the "co-conspirators"), participated in a scheme to defraud the IRS by devising, marketing, and implementing fraudulent tax shelters. HVB's participation in the scheme centered on its role in purportedly providing financing for fraudulent tax shelter transactions.

5. After being enlisted by co-conspirators responsible for the design and marketing of the fraudulent tax shelters, HVB and its co-conspirators implemented these shelters as a means for wealthy individuals with taxable income or gain generally in excess of $5 million (and, for one shelter in particular, in excess of $20 million) to fraudulently eliminate or reduce the tax paid to the IRS on that income or gain. As marketed and implemented, the tax shelters served as a mechanism for allowing wealthy individuals who were otherwise required to pay U.S. individual income taxes generally exceeding 20% to 35% of the income or gain, to instead choose the amount of tax loss desired and pay fees in a much lower amount to HVB and certain of its co-conspirators. In connection with the fraudulent tax shelters, the fees would be part of an all-in cost generally equal to

approximately 5 to 7% of the desired tax loss; the "all-in" cost included the fees of HVB and other promoters, including accounting firms, tax shelter boutiques, various law firms that supplied opinion letters, and others, as well as a small portion that would be used to execute purported "investments" that were designed to make it appear that the shelters were legitimate "investments" rather than tax shelters. The size of the purported "investments," the timing of the transactions, and the amount of the fees to certain co-conspirators and participants were all generally determined based on the tax loss to be generated.

6. In order to conceal the true nature of the tax shelter from the IRS, attempt to evade the wealthy clients' U.S. individual income taxes, and to shield the clients from IRS penalties for underpayment of income taxes, the co-conspirators provided the clients with opinion letters containing false and fraudulent representations and statements and claiming that the tax shelter losses were "more likely than not" to survive IRS challenge. The law in effect from at least in or about August 1997 provided that if a taxpayer claimed a tax benefit that was later disallowed, the IRS could impose substantial penalties, ranging from 20%-40% of the underpayment of tax attributable to the shelter, unless the tax benefit was supported by an independent opinion relied on by the taxpayer in good faith that the tax benefit was "more likely than not" to survive IRS challenge. Thus, the co-conspirators issued false and fraudulent opinion letters with the intent that the clients would claim the fraudulent tax shelter losses on tax returns and provide the opinion letter and other false and

fraudulent transactional documents and/or the false and fraudulent representations and statements contained therein to the IRS if and when the client was audited.

7. Among the fraudulent tax shelter transactions marketed and implemented by HVB and its co-conspirators were: Bond Linked Issue Premium Structure ("BLIPS"), which involved, among others, KPMG, many of its partners and employees, John Larson, Robert Pfaff, David Amir Makov, the Larson/Pfaff/Makov entities, and Raymond J. Ruble, also known as "R.J. Ruble"; CARDS ("Custom Adjustable Rate Debt Structure"), which involved, among others, an attorney at a prominent national law firm and another San Francisco-based tax shelter promoter; and various other transactions involving foreign individuals who were not residing in the United States (hereinafter "non-resident aliens" or "NRAs") and tax-indifferent entities, including 357(c) transactions and Common Trust Fund transactions.

8. BLIPS was marketed and sold from at least in or about 1999 through at least in or about 2000 to at least 186 wealthy individuals, and generated at least $5.1 billion in phony tax losses. HVB acted as the bank in twenty-nine BLIPS transactions that resulted in over $1.2 billion in phony losses claimed by participants and the evasion of over $309 million in income taxes. HVB's fees from those BLIPS transactions were at least $8.8 million.

9. CARDS was marketed and sold from at least in or about 2000 through at least in or about 2001 to at least forty-five wealthy individuals and companies, and

generated at least $1.8 billion in phony tax losses. HVB acted as the bank in approximately twenty-nine CARDS transactions that resulted in over $265 million in phony losses claimed by participants and the evasion of over $91 million in income taxes. HVB's fees from those CARDS transactions were at least $3.3 million.

10. The total amount of taxes evaded through the BLIPS, CARDS, 357(c) and Common Trust Fund transactions in which HVB acted as the bank was approximately $500,000,000.

**The Fraudulent BLIPS Shelter**

11. BLIPS was designed and marketed to generate any amount of capital and ordinary tax losses through a series of pre-arranged transactions that involved the client purportedly borrowing money from one of four banks — HVB, Bank A, Bank C, or Bank E, three of which, including HVB, were audit clients of KPMG at the time — in order to make purported foreign currency investments including currencies that were "pegged" to the United States dollar. In truth and fact, the purported loans were unrelated to the nominal pegged-currency investment component of BLIPS, which used only cash that was contributed by the client and was not funded or secured by the purported loan. The transaction was designed and implemented by HVB and its co-conspirators so that after a short period of time (virtually always approximately 67 days), the client would exit the purported BLIPS transaction and trigger the desired tax loss.

12. In return for fees totaling approximately 7% of the desired tax loss, including a fee to HVB equal to approximately 1.25% of the desired tax loss, a fee to KPMG equal to approximately 1.25% of the desired tax loss, a fee to the Larson/Pfaff/Makov entities equal to approximately 2.75% of the desired tax loss, and a fee to Ruble and his law firm generally equal to approximately $50,000 per transaction, HVB and its co-conspirators and others marketed and caused to be marketed, and implemented and caused to be implemented the BLIPS transactions, and generated and caused to be generated false and fraudulent documentation to support the transactions, including but not limited to opinion letters of KPMG and the Ruble law firm that claimed that the purported tax losses generated by the shelters were more likely than not to withstand challenge by the IRS. In general, all of these opinion letters were identical, except for the names of the clients and entities involved, the dates, and the dollar amounts involved in the transactions.

13. HVB knew that its co-conspirators issued and caused to be issued the opinion letters although, as HVB and its co-conspirators well knew, the opinion letters and other documents used to implement BLIPS were false and fraudulent in a number of ways, including but not limited to the following:

a. BLIPS was falsely and misleadingly described as an investment program, when, in truth and in fact, as HVB knew, BLIPS was designed, marketed, and implemented to generate phony tax losses in order to eliminate income taxes for wealthy clients and garner substantial, guaranteed fees and income for HVB, KPMG,

the Larson/Pfaff/Makov entities, Raymond J. Ruble and his law firm, and certain co-conspirators and others.

b. BLIPS was falsely described as a three-stage, seven-year investment program, when, in truth and in fact, as HVB knew, all participants intended and fully expected to withdraw at the earliest opportunity and within the same tax year in order to obtain their tax losses. Indeed, HVB's co-conspirators caused the opinion letters to contain a false representation (which was adopted by BLIPS clients) that the duration of the client's participation in the three-phase, seven-year investment program was dependent upon the performance of the program relative to alternative investments, when, in truth and in fact, as HVB knew, the duration of the client's participation was dependant on the client's desire to obtain the phony tax losses to be generated. Every BLIPS client who participated in BLIPS through HVB in 1999 commenced his or her BLIPS transaction in October 1999 and withdrew before year end. Every BLIPS client who participated in BLIPS through HVB in 2000 commenced and withdrew from his or her BLIPS transaction before year end and within approximately 60 days.

c. BLIPS was falsely described as a "highly leveraged" investment program, when, in truth and in fact, as HVB knew, the purported loans that were part of BLIPS (and were the aspect of BLIPS that purported to generate the tax loss) were shams — no money ever left the bank and none of the banks assigned any capital cost

to these purported BLIPS loans. Indeed, HVB and at least one of the other banks did not fund the loans at all — they neither set aside from their own funds nor obtained from the market any money to cover these purported "loans" and "loan premiums." In addition, the sham loans were not in any way used in the purported "investment" program involving trades relating to pegged currencies but, instead, were used only to generate a phony tax loss. As HVB knew and intended, the only money used in making and securing the trades involving pegged currencies was money contributed by the client as part of the 7% all-in cost.

d. The BLIPS opinion letters falsely stated that the client (based on the client's purported "independent review") as well as the Larson/Pfaff/Makov entities, "believed there was a reasonable opportunity to earn a reasonable pre-tax profit from the [BLIPS] transactions," when, in truth and in fact, as HVB knew, there was no "reasonable likelihood of earning a reasonable pre-tax profit" from BLIPS, and instead the "investment" component of BLIPS was negligible, unrelated to the large sham "loans" that were the key elements of the purported tax benefits of BLIPS, and was simply window dressing for the BLIPS tax shelter fraud.

e. The opinion letters and other transaction documents, which HVB reviewed prior to the commencement of the transactions, were misleadingly drafted to create the false impression that KPMG, the Larson/Pfaff/Makov entities, Ruble and his law firm, and others were independent service providers and advisors, when

in truth and in fact they jointly developed and marketed the BLIPS shelter. Thus, for example, the KPMG BLIPS opinion letter misleadingly claimed that the client "requested our opinion regarding the U.S. federal income tax consequences of certain investment transactions that have been concluded" but the opinion letters, which falsely described a purported seven-year investment program and a withdrawal from that program based on the purported investment performance of the program, were drafted prior to the commencement of any BLIPS transaction.

f. Similarly, the KPMG engagement letter used for BLIPS contained the following false and fraudulent statements, among others, (i) that the client had engaged KPMG "to provide tax consulting services . . . with respect to participation in an investment program involving investments in foreign currency positions," when, in truth and in fact, KPMG marketed a tax shelter to the clients, and the clients engaged KPMG to assist the clients in generating phony tax losses using the tax shelter; (ii) that KPMG "understands that Client intends to engage" the Larson/Pfaff/Makov entities "to provide Client with investment advisory services and trading strategies," when, in truth and in fact, the Larson/Pfaff/Makov entities were engaged to assist the clients in generating phony tax losses using a tax shelter; (iii) that the Larson/Pfaff/Makov entities "had advised the Client that the utilization of a high degree of leverage is integral to the Investment Program," when, in truth and in fact, the purported "leverage" was a sham loan designed only to support the creating

of phony tax losses; and (iv) that KPMG's fees would not be dependent on "the amount of any tax savings projected," when, in truth and in fact, as HVB knew, the amount of KPMG's fee, as well as the size of the nominal investment made as part of the fraudulent tax shelter, and fees for the Larson/Pfaff/Makov entities, HVB, and other participants in the transaction were all determined by the amount of phony tax losses desired by the client to offset income or gain received from other sources.

**The Fraudulent CARDS Shelter**

14. CARDS was designed to generate substantial capital and ordinary tax losses through a series of pre-arranged transactions that involved a purported 30-year loan negotiated between HVB or Bank A and an entity controlled by NRAs, which entity was required to deposit the purported loan proceeds plus additional collateral into an account at HVB or Bank A; the entity thereafter allegedly conveyed approximately 15% of the loan proceeds (which also served as the collateral for the purported loan) to a United States client who was purportedly seeking financing, in exchange for which the client agreed to become a co-obligor on the purported bank loan. In truth and fact, the purported CARDS loan was a sham that was unrelated to any legitimate financing or business activities and involved no *bona fide* negotiations of its terms by the NRAs; instead, the terms and conditions of the purported loan were pre-arranged by HVB and its co-conspirators. Moreover, the amount of the purported loan was calculated to produce a pre-determined tax loss for the client, and the entire transaction was funded with fees paid by the client, which fees were determined

as a percentage of the desired tax loss. The transaction was designed and implemented by HVB and its co-conspirators so that, after a short period of time (approximately one year), the U.S. client would exit the purported CARDS transaction and claim the desired tax loss, the amount of which was roughly equivalent to size of the purported loan that had been assumed.

15. In return for substantial, guaranteed fees, HVB and its co-conspirators and others implemented and caused to be implemented the CARDS transactions and generated and caused to be generated false and fraudulent documentation to support the transactions, including but not limited to opinion letters claiming that the purported tax losses generated by the CARDS tax shelters were more likely than not to withstand challenge by the IRS. In general, all of these opinion letters were identical, except for the names of the clients and entities involved, the dates, and the dollar amounts involved in the transactions. In addition, the CARDS opinion letters were written by an attorney at a prominent national law firm, which firm also supplied an attorney to purportedly represent the NRAs in the same CARDS transactions.

16. HVB knew that its co-conspirators issued and caused to be issued the opinion letters although, as HVB and its co-conspirators well knew, the opinion letters and other documents used to implement CARDS were false and fraudulent in a number of ways, including but not limited to the following:

a. CARDS was falsely and misleadingly described as a long-term business financing program, when, in truth and in fact, as HVB knew, CARDS was designed, marketed, and implemented as a series of pre-planned steps intended to generate phony tax losses in order to eliminate income taxes for wealthy individuals or companies and, in exchange, to garner substantial, guaranteed fees and income for HVB, certain co-conspirators, and others.

b. CARDS was falsely described as involving long-term "financing" through a thirty-year "loan," when, in truth and in fact, as HVB knew, all participants were expected to withdraw at the earliest opportunity — that is, within approximately one year of the inception of the loan — in order to obtain their tax losses. Thus, although HVB and its co-conspirators claimed that CARDS involved a thirty-year loan, in truth and fact, as HVB and its co-conspirators knew, CARDS involved a purported loan that was intended and expected to last only approximately one year.

c. The purported "loan" that was the centerpiece of the CARDS transactions was a sham because, as HVB and its co-conspirators knew: the NRAs that were inserted into the transaction as the purported initial borrowers had no substantial assets; the proceeds of the purported "loan" were left in the control of HVB, and the "loan" funds, as well as the collateral for the loan, could be used only for those investments that HVB, in its unfettered discretion, deemed acceptable; and HVB had the unilateral right to "call", or cancel, the loan at or around the one-year

anniversary of the loan, and had the unfettered right to insist at any time that the "borrower" post collateral equal to the annual amount of interest due, including interest that had not yet accrued. Thus, although CARDS was touted as involving "financing" to the participants, in truth and fact, as HVB and its co-conspirators well knew, no actual financing was provided because HVB would not permit any of the loan proceeds to leave HVB to serve as financing unless the purported "borrower" delivered to HVB cash or cash equivalents to secure the use of any of the loan. Specifically, in order to obtain $1 of CARDS "financing" from HVB, the "borrower" had to first give to HVB more than $1 in cash or cash equivalents.

d. HVB's co-conspirators caused the opinion letter that was sent to clients to contain a false representation (which CARDS clients adopted) that the client seeking the tax loss "reasonably believe[ed]" that the CARDS transaction could be employed to generate a return that "will exceed by more than a de minimus amount the all-in cost of borrowing," when, in truth and fact, as HVB and its co-conspirators well knew, there was no reasonable likelihood of generating such a return from CARDS, and, instead, the purported financing component of CARDS was negligible, and was simply window dressing for the CARDS tax shelter fraud.

e. CARDS was falsely described as involving "nonresident alien individuals" who, through an entity they formed, were the original borrowers of the purported CARDS "loan" funds, when, in truth and fact, the NRAs had no genuine

intent to borrow funds from HVB and were not *bona fide* participants in the CARDS transactions but were, instead, nominees and puppets of the co-conspirators.

**<u>The Other Fraudulent Shelters Using NRAs And Tax-Indifferent Parties</u>**

17. In addition to CARDS, HVB was involved in a series of additional tax shelter transactions that utilized NRAs and tax-indifferent parties as purported participants whose NRA and tax indifferent status exempted them from United States taxation. Those transactions were fraudulent in that, among other things, as HVB well knew (i) the NRAs enlisted to participate in the transactions were not *bona fide* participants in the transactions but were, instead, nominees and puppets of the co-conspirators who were enlisted simply for their tax-exempt status, and (ii) the participants in the transactions represented that they had legitimate business purposes for the transactions whereas, in truth and fact, the participants took part simply to generate tax losses.

**<u>Statutory Allegations</u>**

18. From at least in or about 1996 through at least in or about 2003, HVB, the defendant, and its co-conspirators, unlawfully, willfully and knowingly, did combine, conspire, confederate and agree together and with each other to defraud the United States and an agency thereof, to wit, the Internal Revenue Service ("IRS") of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201, 7206(1), and 7206(2).

**Objects of the Conspiracy**

19. It was a part and an object of the conspiracy that HVB, the defendant, and its co-conspirators, unlawfully, willfully and knowingly would and did defraud the United States of America and the IRS by impeding, impairing, defeating and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

20. It was further a part and an object of the conspiracy that HVB, the defendant, and its co-conspirators, unlawfully, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by tax shelter clients and others, in violation of Title 26, United States Code, Section 7201.

21. It was further a part and an object of the conspiracy that various co-conspirators, unlawfully, wilfully and knowingly, would and did (a) make and subscribe, and cause others to make and subscribe United States individual, corporation, and partnership income tax returns, which returns contained and were verified by written declarations that they were made under the penalties of perjury, and that the defendants and their co-conspirators did not believe to be true and correct as to every material matter; and (b) aid and assist in, and procure, counsel, and advise the preparation and presentation under, the internal revenue laws, of certain United States individual, corporation, and partnership

income tax returns which were fraudulent and false as to material matters, in violation of Title 26, United States Code, Section 7206.

**Means and Methods of the Conspiracy**

22. Among the means and methods by which HVB, the defendant, and its co-conspirators would and did carry out the conspiracy were the following:

a. They would and did implement fraudulent tax shelter transactions and false and fraudulent factual scenarios to support them so that wealthy United States citizens would pay certain of the co-conspirators and other participants in the transactions substantial fees instead of paying federal and state taxes on that income or gain.

b. They would and did prepare and utilize false and fraudulent documents to deceive the IRS, including but not limited to, engagement letters, transactional documents, representation letters, and opinion letters.

c. They would and did make false and fraudulent representations that co-conspirators employed in the opinion letters that purported to justify deducting the phony tax shelter losses on U.S. Income Tax Returns.

d. They would and did cause to be prepared tax returns that were false and fraudulent because, among other things, they incorporated the phony tax losses and therefore substantially understated the tax due and owing by the shelter clients.

e. They would and did make certain false and misleading entries in the

records of HVB in order to disguise the fraudulent nature of the tax shelter transactions in which it participated.

**Overt Acts**

23. In furtherance of the conspiracy and to effect the illegal objects thereof, HVB, the defendant, and its co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a. In or about and between 1996 and 2001, HVB participated in several tax shelter transactions involving nominee NRAs.

b. In or about and between September and October 1999, Domenick DeGiorgio, a co-conspirator not named as a defendant herein, met at the offices of HVB in the Southern District of New York with Robert Pfaff and David Amir Makov.

c. In or about 1999, in the Southern District of New York and elsewhere, HVB prepared and caused to be prepared transactional documents relating to BLIPS tax shelter transactions.

d. In or about October 1999, in order to disguise and conceal the nature of certain currency transactions relating to BLIPS, a representative of the Larson/Pfaff/Makov entities, one of the co-promoters of the BLIPS transactions, requested a treasury official of HVB in New York to execute swap transactions

involving BLIPS "loans" by employing two separate trade tickets rather than a single swap transaction ticket, as was the customary procedure.

e. In or about mid-October 1999, KPMG deployed a number of its partners and other personnel to the New York, New York offices of HVB to aid in implementing various BLIPS tax shelter transactions in order to allow the transactions to be initiated and terminated by the end of the calendar year.

f. In or about October 1999, HVB caused certain false entries to be made to its books relating to the purported BLIPS "loans".

g. In or about and between 1999 and 2001, HVB participated in approximately 29 fraudulent CARDS tax shelter transactions.

h. In or about and between 1999 and 2002, in the Southern District of New York and elsewhere, co-conspirators prepared and caused to be prepared, signed and caused to be signed, and filed and caused to be filed tax returns that falsely and fraudulently claimed phony tax losses generated by the BLIPS, CARDS, and NRA and Common Trust Fund tax shelter transactions.

(Title 18, United States Code, Section 371.)

Michael J. Garcia

MICHAEL J. GARCIA
United States Attorney