**Statement of Admitted Facts**

1. The parties entering the Deferred Prosecution Agreement and agreeing to the statement of facts set forth herein are Bayerische Hypo- und Vereinsbank AG and HVB U.S. Finance Inc. Bayerische Hypo- und Vereinsbank AG is a Germany-based financial institution that operated in the United States through its branch at 150 East 42d Street, New York, New York. It is and was the parent to various subsidiaries, including HVB Risk Management Products Inc., HVB U.S. Finance Inc. (formerly known as HVB Structured Finance Inc.), and HVB America Inc. Collectively, all of the foregoing entities are referred to herein as "HVB."

2. As set forth in more detail below, between 1996 and 2002 HVB participated in a number of fraudulent tax shelter transactions devised by others, including a series of transactions known as "Bond Linked Issue Premium Structure" ("BLIPS"), Custom Adjustable Rate Debt Structure" ("CARDS"), "common trust fund," and "357(c)" transactions. HVB's activities in connection with these and other transactions included: (i) participating in transactions purporting to be loans that were not bona fide loans; (ii) participating in trading activity on instructions from promoters that was intended to create the appearance of investment activity but that had no real substance; (iii) participating in creating documentation that contained false representations concerning the purpose and design of the transactions; and (iv) engaging in activity with others, including accounting firms, investment advisory firms, various individuals affiliated with those entities, lawyers, and clients (defined herein to include the high net worth U.S. individuals and the purported entities they created who participated in the transactions to obtain and generate the tax losses), all directed toward the implementation of the tax shelters designed to defraud the United States.

3. The conduct described herein occurred under the supervision and direction of HVB's then-employee Domenick DeGiorgio ("DeGiorgio") and others in DeGiorgio's group. DeGiorgio rose to be a senior vice president of HVB's subsidiary, HVB Structured Finance Inc., and he ran a group of HVB employees known as the Financial Engineering Department ("FNE"). Internally at HVB, DeGiorgio accurately described many aspects of the shelter transactions that should have led HVB to refuse to participate in the transactions. However, DeGiorgio also made false and misleading representations concerning the legitimacy of various transactions to HVB personnel. HVB's wrongful conduct is largely derived from the wrongful actions of DeGiorgio, but HVB placed DeGiorgio in a senior position, permitted him to operate and manage FNE with few controls, and rewarded him for generating substantial guaranteed fees for the bank by participating, with the approval of the bank, in tax shelter transactions. HVB therefore accepts full responsibility for its participation in these transactions and for HVB's failure to prevent and detect them.

4. HVB's supervisory and internal controls at the time failed to prevent and detect the improper and illegal conduct by DeGiorgio and HVB's involvement with the fraudulent tax shelter activity. Specifically, for example, HVB did not have proper policies and procedures for analyzing tax-motivated transactions in which HVB was participating nor for involving the Tax Department in an appropriate analysis and approval process for such transactions. Further, DeGiorgio colluded with other individuals and entities outside of HVB to evade the

internal control systems that were then in place at HVB with respect to the receipt and distribution of tax shelter fees among co-conspirators, including DeGiorgio.

**Fraudulent Tax Shelter Activities**

5. HVB participated in various tax shelter transactions, including approximately 29 BLIPS TRANSACTIONS, approximately 29 "Custom Adjustable Rate Debt Structure" ("CARDS") TRANSACTIONS, a series of 23 "common trust fund" transactions, and several transactions referred to as "357(c)" transactions.

**BLIPS**

6. DeGiorgio brought the BLIPS transactions to HVB through his prior contacts with the principals of a West Coast tax shelter promoter, who were former employees of the international accounting firm KPMG. DeGiorgio was initially contacted in early August, 1999 by a partner in the West Coast tax shelter promoter, who claimed that his firm, KPMG, and others had developed a tax shelter program for high net-worth individuals, and asked if HVB would participate in the transactions. DeGiorgio advised other HVB officers that another bank had financed a number of the same transactions, and that the other bank wanted additional financial services providers to participate in the program.

7. Over the course of the subsequent months, DeGiorgio and others at HVB took the steps necessary to have the BLIPS series of transactions approved within HVB. HVB obtained a set of form transaction documents from a New York law firm ("Law Firm No. 1") that had prepared them for the other bank referred to in paragraph 6. DeGiorgio and others in the FNE group also prepared and circulated a credit request memorandum that summarized the BLIPS transaction and sought the internal credit approvals. The credit request memorandum underwent several revisions and multiple levels of review, including even a meeting between DeGiorgio and the management of HVB in Munich, Germany. The BLIPS credit memo set forth various aspects of the BLIPS transactions that made clear that: the transactions were solely tax-motivated and in practical terms involved no credit or investment risks; although couched as 7-year transactions, the BLIPS transactions were fully expected to be unwound within 60 days; and HVB's profit potential on the BLIPS transactions was substantially dependent on the transactions being unwound within 60 days.

8. HVB personnel were aware that the BLIPS transactions were unusual and did not fit within HVB's established banking procedures at the time. Accordingly, HVB personnel had to create special procedures in order to enter the transactions on HVB's accounting books and records.

9. HVB obtained a copy of a draft KPMG opinion on the underlying tax merits of the BLIPS transaction, and it was aware that a major New York law firm ("Law Firm No. 2") was being paid to provide a separate opinion to the purported investors. HVB also obtained its own opinion from Law Firm No. 1 with regard to whether it had any tax shelter registration and list maintenance obligations, but it did not seek or obtain an independent opinion with respect to the legitimacy of the BLIPS transactions, based on the true facts of the transactions.

Both of the aforementioned opinions, which HVB reviewed, were based on certain incomplete, false, and misleading representations, including misrepresentations about facts well known to HVB.

10. HVB participated in a first tranche of BLIPS transactions in 1999. In order to complete the transactions in time for them to be unwound 60 days later but still before the end of the year, they had to be entered hurriedly in October, 1999. As a consequence, KPMG personnel were located at HVB's New York offices to assist in compiling the required loan closing materials and documentation. Permitting KPMG personnel to complete HVB's documentation and to conduct HVB's processing of the BLIPS transactions was a departure from ordinary bank practices and inconsistent with HVB's own "know your customer" procedures.

11. The "loans" entered into by HVB in the BLIPS transaction were not bona fide. The purported loans had no legitimate business purpose other than reducing the taxes of the BLIPS customers. Moreover, the entities to which the "loans" were made were not creditworthy, their only significant assets were the proceeds of the "loans," and these assets were in turn pledged as collateral for the "loans" themselves. The "funds loaned" to the clients in the BLIPS transactions were required to be deposited back into demand deposit accounts in the clients' names at HVB. As a consequence, the only purported movements or transfers of funds in connection with the "loans" were made via entries on HVB's books of account, and none of the funds "loaned" ever left HVB's custody and control. Finally, HVB did not set aside any of its existing capital or go to the capital markets to acquire funds to make the purported loans.

12. HVB, however, agreed to help prepare and execute documents that made it falsely appear the "loans" were part of a purported highly-leveraged investment program on the part of the clients. There was no highly leveraged investment program. The forward contracts that involved shorting foreign currencies pegged to the U.S. dollar (hereinafter referred to as "the forward contracts") were funded through separate cash funds provided by the clients as part of the "all-in" cost for participating in BLIPS. Nonetheless, the transaction documents made it appear that "loan" funds were borrowed to provide "leverage" for the forward contracts, which were to be the ostensible foreign currency investments of the clients in the BLIPS transactions. In fact, the borrowed funds could not be used for this purpose and thus did not provide any leverage. In addition, although the documents used to implement the transactions stated that the forward contracts could serve as collateral for the purported loan, in practical terms these contracts had no value and therefore would not have provided any collateral for the purported loan in the event of a loan "default." Moreover, the "loans" were documented as seven year loans with options to "unwind" after 60 days or 180 days. This was necessary in order for the unusual "premium" structure of the purported loans to generate the illegal tax benefits sought by the clients. In fact, however, it was prearranged that all the "borrowers" would unwind their transactions in 60 days, and the clients never had any intention to maintain the loans for longer periods. It was because of all of these arrangements and agreements that HVB saw no need to set aside capital or acquire funds to fund the "loans." HVB wrongfully agreed to this structure and to these misrepresentations made by participants

in the transactions, including that they were entering into a highly leveraged investment program, and that they were really entering transactions with seven-year loans.

13. The transactions were designed to create the false impression that the client/"borrowers" had entered seven-year loans with an unusual "premium" structure at an interest rate well above prevailing market rates. In fact, the "loans" were entered using an estimated interest rate figure that was necessarily inaccurate, since the actual nominal rate was not known until approximately one week after the initial "loans" were entered. At that time, the clients and HVB entered interest rate swaps with a retroactive effective date to the date of the initial book entries, setting the "nominal" rate on the principal portion of the loan that generated the purported "premium." The net effect of the swaps, however, was that the clients would pay only a market rate of interest on the full amount of the loaned funds (principal and purported "premium"). In other words, although the "loans" were represented in the transaction documents and opinion letters to be above-market, fixed-rate loans with a premium, they were intended from inception to be variable-rate loans with no premium. This entire series of transactions was necessary for the purported loans to generate the illegal tax benefits sought by the clients, and had no other legitimate business purpose.

14. HVB, with other entities, professionals and the clients, participated in creating, accepting, or transmitting documents, including loan and loan-related agreements and representation letters, which contained false representations designed to assist the clients in achieving unlawful tax benefits. In addition to the misrepresentations described above, these included specific statements in representation letters signed by DeGiorgio and others, on behalf of HVB, that HVB would not require early termination of the BLIPS transactions nor require assignment of the loans. These statements were meant to convey the false impression that the BLIPS transactions were in the ordinary course of HVB's banking business. Similarly, the documents falsely suggested that the loan term might extend for the full seven years, when in fact HVB and its co-conspirators knew that was not the case, and that there was a possibility that the loans would not be assigned, when in fact the assignments were pre-arranged and fully expected and understood to occur, because those steps were integral to the tax strategy involved.

15. Although individual clients entered the BLIPS transactions with HVB, the transactions were approved by HVB in two tranches, in the aggregate. In a departure from routine banking practices, HVB did not subject the individual clients to scrutiny as to their creditworthiness, in substantial part because it was understood that the funds purportedly loaned would never leave the custody and control of HVB. Likewise, the forward contracts, which HVB conducted on behalf of the BLIPS clients, were executed in the aggregate at the direction of the West Coast tax shelter promoter and then allocated among the individual clients' BLIPS transactions. The absence of individual treatment of the BLIPS clients was a departure from HVB's ordinary practices and inconsistent with routine banking procedures.

16. In the course of entering the BLIPS transactions, HVB acceded to instructions from the West Coast tax shelter promoter to show both sides of certain currency swap transactions on separate confirmation tickets, rather than grouped onto one ticket as was

HVB's ordinary practice. HVB's representatives acceded to this request and altered the documentation despite it being inconsistent with HVB's ordinary practice. In fact, there was no business purpose for documenting the transactions as the West Coast tax shelter promoter instructed HVB. Rather, the sole purpose for this instruction was to make it appear that the currency trades were separate parts of a substantive investment strategy, which was not the case.

17. All of the BLIPS transactions in the first tranche in fact were unwound at the 60-day mark, before the end of 1999, so that the clients could claim phony tax losses in that year. Despite knowing that all of the first BLIPS transactions had been unwound in 60 days, HVB nevertheless engaged in a second tranche of BLIPS transactions in 2000, based on the same false and misleading documentation.

**Other Transactions**

18. HVB participated with various entities, professionals and clients in other tax shelter transactions besides BLIPS that involved similarly fraudulent and illegal elements.

19. For example, under DeGiorgio's supervision HVB participated in a series of transactions known as "CARDS" (for "Custom Adjustable Rate Debt Structure"), in which HVB made loans with a purported 30-year term, when all parties involved, including the clients/"borrowers," knew that the transactions would be unwound in approximately one year in order to generate the phony tax benefits sought by the client participants. In other words, the documentation used to implement CARDS, including documentation created and executed by HVB, falsely stated that the loans were 30-year loans whereas, in truth and fact, as HVB and other participants knew and understood, they were loans of approximately one year in duration. The CARDS transactions also involved false representations, on the part of DeGiorgio on behalf of HVB, and on behalf of the clients/"borrowers," that the transactions were being entered for legitimate business purposes and that the material terms of the loan agreements had been negotiated at arms length. In fact, these representations were untrue, and the transactions were prearranged by the promoters to be unwound within one year and had no purpose other than generating tax benefits for the clients involved.

20. In order to generate the improper tax benefits, the CARDS transactions also involved the participation of an ostensibly neutral third party who was not a resident of the United States. HVB and its co-conspirators knew that the foreign third parties who entered the CARDS transactions were merely nominees who had no legitimate business purpose in entering the transaction and who were simply being paid to lend their neutral U.S. tax status to the transaction in order to enable the U.S. client to obtain their claimed tax benefits.

21. Such puppet, tax-neutral parties were similarly present in other transactions entered by HVB, including several so-called 357(c) transactions. These nominees operated under the direction of DeGiorgio and others and were not bona fide participants in the tax shelter transactions. Instead, they were used by the tax shelter promoters as entities and people

to whom taxable income would be assigned so that the United States citizens who participated in the transactions could falsely claim tax losses to eliminate the taxes they owed.

22. In connection with these transactions, including CARDS and the 357(c) transactions, DeGiorgio improperly manipulated internal HVB demand deposit accounts, through which various payments related to these transactions were run. These accounts were also misused by DeGiorgio for a variety of personal purposes unrelated to the business of HVB. HVB acknowledges that permitting loan officers to have control over such internal accounts was inconsistent with proper banking practices. Prior to the investigations into tax shelters conducted by various Government agencies, HVB changed its procedures to no longer permit such accounts, and it has implemented additional controls to prevent a recurrence of DeGiorgio's improper conduct.

23. Another recurring feature of the tax shelter transactions that DeGiorgio involved HVB in is that they were all promoted by many of the same individuals, all of whom had close ties to DeGiorgio. Some of these individuals colluded with DeGiorgio to evade HVB's internal controls and to enable the improper use of funds in the accounts. Again, HVB acknowledges that its controls at the time were insufficient to prevent and detect DeGiorgio's misuse of these accounts, and it has implemented additional controls to prevent a recurrence.

**Post Transaction Conduct**

24. Prior to the grand jury investigation, HVB took a number of steps to exit the tax shelter business. These included:(i) disbanding the FNE department and ending participation in the aforementioned tax shelter transactions, which led to the departure of DeGiorgio and others; (ii) improving internal controls, specifically no longer permitting account officers to control transaction accounting after closing, requiring additional customer loan servicing reports to account officers and credit officers, eliminating retail accounts for internal departments, and revising the credit approval process; and (iii) providing HVB's Tax Department with greater oversight responsibilities. HVB wants to ensure its continuing compliance with the law and adherence to the highest levels of integrity and ethics in its financial practices.

25. HVB cooperated with the IRS during its investigation and provided substantial and important assistance to the investigating agents and prosecutors during the course of the grand jury investigation in the Southern District of New York. Among other things, HVB waived its attorney-client privilege with respect to the transactions at issue; it made various personnel from HVB, including a member of HVB's management committee, available for numerous interviews; at substantial expense to HVB, it engaged an independent outside consultant to ensure the integrity of the subpoena compliance process and facilitated access by the Government to large databases of HVB material and voluminous documents; and it responded to numerous requests from investigators and prosecutors for various specific items of information. HVB also brought to the government's attention evidence concerning DeGiorgio's efforts wrongfully to enrich himself and to misuse HVB accounts he controlled.

26. As part of its own compliance program and in connection with the Deferred Prosecution Agreement, HVB is undertaking additional compliance improvements, including: (i) agreeing not to obtain any tax services from its audit firm or professionals in that firm; (ii) implementing new procedures regarding the review and approval of transactions that have potential tax benefits, and the Tax Department's compliance with IRS opinion standards and registration and list maintenance obligations; (iii) a training and educational program for relevant personnel regarding compliance with tax and banking laws, and (iv) adoption of ethics and "best practices" guidelines for HVB employees to follow in carrying out bank duties. In addition, HVB has agreed to pay a total of $29,635,125 to the United States, which includes: disgorgement of fees collected in connection with the aforementioned tax shelter transactions; payment to the IRS of civil penalties related to its list maintenance and registration obligations in connection with the transactions under investigation; and restitution to the IRS. HVB has also pledged to, and will continue to, cooperate with any investigation relating to its tax shelter activities.